## CAWTHON *v.* THE STATE.

1. Prior to 1898 any criminal case might be carried to the Supreme Court on a direct bill of exceptions specifying the errors of law complained of, without making a motion for a new trial.

2. The act of December 20, 1898 (Acts 1898, p. 92, Van Epps' Code Supp. § 6241), authorizing the Supreme Court to consider assignments of error in a direct bill of exceptions where no motion for a new trial is made, is simply declaratory of the law as it existed at the date of the passage of the act, and is not exhaustive of the right of this court to entertain jurisdiction of direct writs of error.

3. This court can not consider as a brief of evidence a document appearing as such in a record or bill of exceptions, unless the record or bill of exceptions affirmatively shows that the document has been approved as correct by the trial judge. And this is true even in a case where counsel agree in the Supreme Court that the document is a correct brief of the evidence and may be considered as such.

4. Evidence of the commission of a crime other than the one charged is generally not admissible.

5. "To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish ; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other."

6. "If the evidence be so dubious that the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt."

7. Where the court, over objection, admits certain evidence, with the statement that the objection will be passed upon at a later stage of the trial, it is incumbent upon the objecting party, if the evidence be inadmissible, to direct the court's attention thereto either before or at the close of the testimony, and to move to exclude it ; and upon his failure to do this he will be held to have waived his objection.

8. Even if an attorney, by virtue of the relation of attorney and client existing between himself and one charged with a felony, has no implied authority to waive the right of his client to be present at the reception of the verdict, if the attorney makes an express waiver to this effect in the presence of the client, who does not at the time repudiate the action of his counsel, a verdict afterwards received in the absence of the accused and in consequence of the waiver will not be held to be invalid at the instance of the accused, seeking, after the reception of the verdict, to repudiate the action of his counsel in making the waiver.

9. Before a verdict received in the absence of the accused will be held to be invalid, it is incumbent upon the accused to show that he was in custody of the law at the time the waiver was made, that he made no waiver of his right to be present, and that he did not authorize his counsel to make such waiver for him, and, if an unauthorized waiver has been made by counsel, that he has not ratified the same or allowed the court to act upon the waiver of counsel after he has notice that the same has been made.

FISH, P. J., dissenting. This case having been brought to the Supreme Court by a direct bill of exceptions, no motion for a new trial having been made, and it appearing, in my opinion, that no ruling or order of the trial judge upon which error was assigned necessarily controlled the verdict rendered, it follows that, under the act of 1898 (Van Epps's Code Supp. § 6241) and the former adjudications of this court, such rulings and orders can not be reviewed.    *Taylor* v. *Reese*, 108 *Ga.* 379 ; *Smith* v. *Smith*, 112 *Ga.* 351 ; *Wright* v. *Hollywood Cemetery Co.*, Ib., 884 (6) ; *Ocean Steamship Co.* v. *Hamilton*, Ib. 901 ; *Ray* v. *Morgan*, Ib. 923 ; *Darien Bank* v. *Clark Lumber Co.*, Ib. 951 ; *Parker* v. *Medlock*, 117 *Ga.* 813 ; *Binion* v. *Georgia Southern & Fla. Ry. Co.*, 118 *Ga.* 282 ; *Cable Co.* v. *Parantha*, Ib. 913.

CANDLER, J., dissenting. 1. Since the passage of the act approved December 20, 1898 (Acts 1898, p. 92), "to dispense with a motion for new trial and filing brief of the evidence, and to authorize a direct bill of exceptions, in certain cases," to authorize the reversal of a judgment on a bill of exceptions sued out directly to this court without any motion for a new trial having first been filed in the court below, it must appear that "the judgment, decree, or verdict has necessarily been controlled by one or more rul-

ings, orders, decisions, or charges of the court," complained of in the bill of exceptions. The present case, in my opinion, does not come within this requirement of the law.

2. Error will never be presumed, but must be clearly shown. Hence, where there is before this court no brief of evidence which it is authorized to consider, the judgment of the court below should not be reversed because the judge admitted evidence of an alleged independent crime, there being nothing before this court to show whether the transaction as to which the evidence objected to was admitted was or was not connected with the crime of which the accused was charged.

3. On the trial of one indicted for murder, evidence of a former attempt by the accused to kill the deceased is admissible, even though it should incidentally develop that in such unsuccessful attempt another person, with whose murder the accused was not charged, was killed.

Argued October 21,—Reargued December 7, 1903. Decided February 12, 1904.

Indictment for murder. Before Judge Roberts. Dodge superior court. August 4, 1903.

The indictment charged Robert D. Cawthon with the murder of R. J. Tucker, in one count, by administering a quantity of strychnine; in another, by causing to be administered a quantity of strychnine to Tucker. There was a verdict of guilty, and exceptions were taken directly to rulings at the trial. The bill of exceptions states, that Tucker died on July 21, 1903, under circumstances indicating that he was the victim of strychnine poisoning, and on the next day his widow and Cawthon were arrested and committed to jail upon the charge of having caused his death by poison, and both of them remained in jail until after the trial and conviction of Cawthon. A special term of the superior court was called, and met on August 3. The indictment was returned and Cawthon was arraigned and put on trial on the same day, not being represented by counsel, except Messrs. C. W. Griffin and D. R. Pearce, appointed for this purpose by the presiding judge; the sheriff having previously notified the court that Cawthon's relatives refused to employ counsel for him. Mr. Griffin had been notified by the judge, on Thursday before the court met on Monday, that he might be appointed to represent the defendant, and he then agreed to defend Cawthon, provided associate counsel was furnished; and at Mr. Griffin's request Mr. Pearce was asked, and consented, to assist in the defense. As Mr. Griffin lived in Eastman, where the trial occurred, he had interviewed the defendant so far as he had opportunity. Mr. Pearce lived in another

county, had no opportunity of conferring with the prisoner, and did not do so until the day on which he was arraigned and put on trial. The jury was selected on Monday, and at half past three o'clock the court adjourned at the request of the defendant's counsel, in order to give them time for consultation and preparation. Ten days before the death of Tucker, Joel Horne had died under circumstances indicating that he had been poisoned with strychnine taken at Tucker's house; and these two deaths were attributed by popular suspicion to Cawthon and Mrs. Tucker. There was no request for postponement or change of venue. "Cawthon was a poor man, and far away from his relations."

The State was allowed to prove the fact of the death of Joel Horne, and the circumstances under which he came to his death, over objection that this evidence was irrelevant, and that the defendant had not been put on notice to meet any charges in regard to the death of Horne. To this objection the judge replied: "I understand the rule to be this, that you may show that other offenses of like character were committed; for instance, that another strychnine poison was committed. Of course the court does not mean to indicate what the State may do in the matter. For instance, in the prosecution of a party for burglary, you may show that other burglaries have been committed. I can not understand what the solicitor-general intends to do, but perhaps it is to show that Mr. Horne about that time died under similar chain of circumstances; and I think it would be competent evidence for the consideration of the jury." The solicitor-general said, "You have correctly stated the rule of law." The judge then said, "Of course the defendant would have to be connected with the matter." Under this ruling the State proved that Joel Horne died in said county, on the way home from the house of Tucker, within an hour or less after taking a drink of peach brandy given to him by Tucker, and that his symptoms while dying, and the condition of his body after death, indicated strychnine poison; and was also allowed to prove that the State chemist found strychnine in a few drops of brandy contained in the bottle alleged to be the one from which Horne drank, without any evidence being introduced to show that Cawthon ever handled or saw said brandy at any time before the death of Horne. There was testimony by one witness, Endelle Tucker,

that after the death of Horne she saw Cawthon pour the remaining brandy out of the bottle from which Horne drank. The accused excepted to the admission of the evidence so objected to.

Dr. J. D. Herrman as a witness was examined as to his having tasted the contents of the bottle from which the State contended and had shown by other witnesses that Horne had drunk poisoned brandy, and that no change had been made in the bottle. Counsel moved to rule out the testimony of Dr. Herrman about strychnine being in the whisky, because there was no allegation in the indictment that the defendant gave the deceased any of the whisky. By the court: "Yes, unless he shows that he gave it to somebody else. I will not rule the question now, but will let it go in for the present." And this testimony thus admitted was never afterwards excluded by the court. It was, in substance, that the contents of the bottle tasted like strychnine and peach brandy; and that the witness noticed, on the lower portion of the flatness of the bottle and on the stopper of the bottle, crystals of strychnine. Exception was taken to the admission of the testimony over the objection, and to the failure of the court afterwards to rule it out. Similar exception was taken to the admission, over objection, of testimony of J. M. McCandless, giving the result of his analysis of a few drops of liquid sticking about on the sides of the bottle from which it was contended by the State that Joel Horne drank poisoned brandy; this testimony being to the effect that there was strychnine in the contents of said bottle.

The court charged the jury as follows: "The contention of the State in this case is that this poison was given by the defendant at the bar, and that fact is denied by the defendant in his plea of not guilty. It is conceded by both sides that if the poison was given by the defendant, that would amount to a case of murder; so that the only question for your determination is, did the party, either by procuring somebody else, or by putting it where Mr. Tucker would get it with the intention that he should get it, or did he administer the poison, and are you satisfied of that from the evidence; and if you are, are you satisfied of it to the exclusion of the reasonable doubt I have described to you; and if you are, of course you will find in accordance with that conviction upon your mind. Upon the other hand, if you are not satisfied to the exclusion of that reasonable doubt which the law gives the

defendant the benefit of, then it would be your duty to find him not guilty." Error was assigned, (1) because the judge had no authority in law to state to the jury that the prisoner had made the concession stated, one of his counsel having stated in argument that if the strychnine was given and death resulted therefrom, it was murder, and the only question for the jury's determination was, did Cawthon administer it, counsel arguing at the time that Cawthon did not give the strychnine; the law placing upon the jury the duty to determine not only whether the prisoner administered the poison as charged, but the grade of the offense in case it was so administered. (2) The evidence having shown that there was strychnine in the house of the deceased (a package of strychnine having been found by the sheriff over the mantel-piece in the kitchen), which was not shown to have been bought by, or to belong to, or ever to have been in the possession of the defendant, it was error to leave the jury to understand that he would be equally guilty if he administered the poison, or if he procured some one else to administer it, or if he put it where Tucker would get it with the intention that he should get it. It is submitted that he might have put the poison where Tucker would get it, with the intention that he should get it, and without any thought that he would take it to his injury.

The court charged: " Now, I have permitted the State to prove in this case that sometime, a short while before Mr. Tucker's death, that Mr. Horne, Joel Horne, also died under circumstances where the State insists that he was also poisoned. You are not trying the party, you must bear that in mind, for the killing of Mr. Horne. I have only permitted it to go before you to be considered in reference to the theory of the State in the matter, — and if I misstate your contention, call my attention to it, gentlemen. Their contention is this: that the party who is on trial, charged with the offense of murder, had prepared whisky impregnated with strychnine, and that that whisky was intended to be taken by Mr. Tucker, the deceased; but that, contrary to the expectations of the defendant (I am simply stating the contention of the State; it is not the purpose, nor the intention, nor the province of the court to state what the facts are), that this same whisky was intended for Mr. Tucker, but that it was given to Mr. Horne; in other words, the State insists that there was a

provision made in that way to take away the life of Mr. Tucker by the use of strychnine poison; and I have allowed that to go before you for your consideration, and to receive just such weight as you think it is entitled to in passing upon the issue involved in this case. As to the amount of weight it is entitled to is purely for you to determine, and it is not the purpose of the court to express to you an opinion as to its probative force and power. You are the exclusive judges of the evidence, and the court has no power nor inclination to intimate to you what has or has not been proved; you are the exclusive judges of the evidence, and the law you take from the court and apply it to the evidence. And you will only consider the evidence in reference to the killing of Mr. Horne so far as it may illustrate any issue upon the trial of this case. See whether or not it illustrates any issue in this case; and if it does, you can give it just such force as you may think it is entitled to." Error was assigned, because (1) there was no legal evidence justifying the jury to consider the death of Joel Horne and its circumstances or causes. (2) The court did not tell the jury clearly and distinctly that they could not consider the death of Horne and its circumstances and causes, unless it was proved to their satisfaction, to the exclusion of a reasonable doubt, that the defendant caused Horne's death. It is admitted that the court charged the jury on the general law of doubt.

The last exception and the facts pertinent to it are fully set forth in divisions 8, 9 of the opinion. The bill of exceptions recites that the defendant files therewith a brief of the evidence introduced on the trial, "and prays that the same may be approved and transmitted as a part of the record in the case." It then specifies, as parts of the record material to a clear understanding of the errors complained of, the indictment, plea, "the brief of the evidence," etc.

*Goodwin, Anderson & Hallman* and *C. W. Griffin*, for plaintiff in error. *John C. Hart, attorney-general*, and *John F. DeLacy, solicitor-general*, contra.

COBB, J. Cawthon was convicted of murder, and sentenced to death. He made no motion for a new trial, but brings his case by a direct writ of error, alleging that certain errors prejudicial to him were committed at the trial.

1, 2.  The attorney-general suggests in his brief that this court has no jurisdiction to pass upon any question made in the bill of exceptions, for the reason that the verdict was not necessarily controlled by any of the rulings, decisions, or charges complained of, within the meaning of the act of December 20, 1898.  See Acts 1898, p. 92, Van Epps' Code Supp. § 6241.  In order to determine the true interpretation to be placed upon the act of 1898 it is necessary to consider the practice as it existed in this court at the date of and prior to the passage of that act.  The act establishing this court declared that "any criminal cause may be carried up to the Supreme Court on a bill of exceptions, in writing, specifying the error or errors of law complained of;" and that "any cause of a civil nature, either on the law or equity side of the superior court, may, in like manner, be carried to the Supreme Court on a bill of exceptions specifying the error or errors complained of in any decision or judgment." See 1 *Ga.* viii, ix.  The first criminal case brought to this court was *Sealy* v. *State*, 1 *Ga.* 213, and the second was *Reynolds* v. *State*, Id. 222.  Hines Holt and Henry L. Benning represented the plaintiff in error in each case.  In the first no motion for a new trial was made, but the case was brought to this court upon a bill of exceptions assigning error upon a ruling refusing to continue the case, upon rulings made while the jury was being empaneled, and upon rulings made on the admission and rejection of evidence. The court entertained jurisdiction of the writ of error, and reversed the judgment.  In *Reynolds* v. *State* the bill of exceptions assigned error upon various rulings at the trial, upon the overruling of a motion to arrest the judgment, and upon the overruling of a motion for a new trial.  The court entertained jurisdiction of this writ of error, and awarded a new trial.  While no question was made in either case or directly passed upon by the court as to what was the proper practice to be pursued, or what was the proper construction of the act organizing the court, the practice followed by lawyers of the standing of those who represented the plaintiffs in error, and acquiesced in by such lawyers as Levi B. Smith, E. H. Worrill, and Absalom H. Chappell, who represented the State in the respective cases, is entitled to very grave consideration when it is to be determined what was the opinion of the profession at that time as to the practice to be pursued in bring-

ing cases to this court. An examination of the records of this court in the earlier volumes will show that the practice above indicated was followed generally by the profession throughout the State, that is, the losing party determined for himself whether he would bring an error of law to this court by direct bill of exceptions or embody it in a motion for a new trial if the ruling was of such a character as could be properly made the ground of such a motion.

That part of the act of 1845, establishing the Supreme Court, which declared what causes should be brought before it, was carried into the Code of 1863 in the following language : "Either party in a civil cause, and the defendant in any criminal proceeding in the Superior Courts of this State, may except to any sentence, judgment, decision, or decree of such court, or of the judge thereof in any matter heard at Chambers. Such bill of exceptions shall specify plainly the decision complained of, and the alleged error, and shall be signed by the party, or his attorney or solicitor." Code of 1863, § 4160. So much of the provision just quoted as relates to criminal cases is embodied in the Penal Code of 1895, § 1070, in the same language. In the early history of this court many cases, both civil and criminal, in which verdicts were rendered were brought to this court by direct writ of error without motions for new trials having been made. In the later history of the court, especially in the more recent years, the practice of making a motion for a new trial, in all cases where such a remedy was appropriate, has prevailed, the bill of exceptions bringing the case to this court assigning error upon the judgment overruling the motion. Prior to 1898 there was no legislation having the effect to change or modify the practice as it existed in the early history of the court. The practice act passed in that year is in the following language: "An act to dispense with a motion for new trial and filing brief of the evidence, and to authorize a direct bill of exceptions, in certain cases. Be it enacted, . . that in any case now or hereafter brought, where the judgment, decree, or verdict has necessarily been controlled by one or more rulings, orders, decisions, or charges of the court, and the losing party desires to except to such judgment, decree, or verdict, and to assign error on the ruling, order, decision, or charge of the court, it shall not be necessary to make a motion for new trial, nor file

a brief of the evidence, but the party complaining shall be permitted to present a bill of exceptions containing only so much of the evidence or statement of facts as may be necessary to enable the Supreme Court to clearly understand the ruling, order, decision, or charge complained of." This act came before this court for construction for the first time in *Taylor* v. *Reese,* 108 *Ga.* 379, which was an application for a mandamus to compel Judge Reese to sign a bill of exceptions tendered to him in a criminal case in which no motion for a new trial had been filed, and which he had refused to certify solely upon the ground that in his opinion he had no authority to do so. This case was thoroughly and carefully considered, and the conclusion was reached that the accused had a right to bring his case to this court in the manner above indicated. In the course of the opinion Mr. Presiding Justice Lumpkin says: "The act of 1898 simply gives in explicit terms a right of which parties litigant frequently availed themselves before its passage." And several cases are cited to illustrate the correctness of this statement. The number of cases in which parties have availed themselves of this right since the establishment of the court could be largely increased by an examination of the records of file in the office of the clerk, as well as the reports of the cases in the published volumes. The learned Presiding Justice further says: "There is enough in each of the bills of exceptions tendered to the judge to enable this court to clearly understand and pass upon the rulings complained of; and if the positions taken by counsel for the accused are well founded, it was the right of the accused to have the jury determine the question whether or not they were guilty of a lower grade of homicide than murder. If the judge committed the errors alleged, they were deprived of this substantial right, and the verdicts actually rendered were necessarily so far controlled by the judge's action as to necessitate a new trial."

In the light of what is said in the opinion in the mandamus case it is important now to look to the opinion in the criminal case when it finally reached this court, to see what were the assignments of error therein raised. One of the assignments of error was upon the refusal of the judge to charge, in substance, that if at the time of the killing Taylor was a member of a chain-gang of which Dennard, the deceased, was a guard, and that if Dennard

endeavored to whip him, before they could find that the attempted punishment was lawful, they must believe from the evidence that the chain-gang was a legal one, and the burden was on the State to prove that it was. Another assignment of error was upon the refusal of the judge to charge that if the evidence failed to show that the weapon used was one in its nature calculated to produce death, and they further believed that the person striking the blow did not in fact intend to kill Dennard, nevertheless the blow was unlawful and they would be justified in finding that the accused was guilty of involuntary manslaughter in the commission of an unlawful act. Another assignment of error was upon the refusal of the judge to charge the law of involuntary manslaughter, though requested in writing to do so; and the bill of exceptions assigned error upon the failure of the judge to charge upon the subject of voluntary manslaughter. Each of these assignments of error was passed upon by this court. It is now contended that, since the passage of the act of 1898, this court has no jurisdiction to entertain a direct bill of exceptions in any case where a verdict has been rendered and a motion for a new trial would be an appropriate remedy, until such a motion has been made and passed upon by the trial judge, except in those cases where it appears distinctly from the bill of exceptions and the record that the ruling complained of was of such a character as to constrain the jury to find the verdict rendered, that is, the ruling must be of such a character that no jury could have legally rendered any other verdict than the one complained of. It is claimed that the effect of the act of 1898 is to abolish altogether the right of this court to review by direct writ of error any other rulings than those of the character above indicated, and that the effect of the act was to work a radical change in the practice which was more or less followed from the time the court was established down to the passage of the act of 1898, and even since that date. This court has on many occasions commended the practice of making a motion for a new trial before filing a bill of exceptions, thus giving to the trial judge an opportunity to review his rulings which are complained of. This court has never held, so far as we are advised, that it was absolutely necessary to make a motion for a new trial in order to give it jurisdiction to review an error of law in a ruling made in the trial of a case.

If the act of 1898 be construed as contended for by counsel for the State, it would be applicable to very few cases; and if it be given the construction which we give it, it preserves to litigants a right which has existed ever since the establishment of the court.    We do not think it was the purpose of the General Assembly to abolish this long-established practice, nor do we think the language of the act, properly construed, has this effect. We did not think so when the case of *Taylor* v. *Reese* was before us.    The language of Mr. Presiding Justice Lumpkin, above quoted, who was speaking for the entire court, after a careful investigation both individually and collectively, indicates that it was our opinion at that time that the act of 1898 was only declaratory of existing law, being a recognition of the practice which had long been followed with the approval of the bar and without the disapproval of the bench.    It is impossible for any one to carefully examine the assignments of error which were dealt with in *Taylor* v. *State* and reach the conclusion that the act of 1898 was then construed as is now contended for by counsel for the State.  None of the rulings which were considered and passed upon in that case were of such a character as to constrain the jury to find the verdict rendered.    The alleged errors were, as held in *Taylor* v. *Reese,* simply of such a character as deprived the accused of a substantial right; and, using the language of the learned Justice who wrote the opinion, "the verdicts actually rendered were necessarily so far controlled by the judge's action as to necessitate a new trial."    A careful consideration of the opinion in *Taylor* v. *Reese* as well as that in *Taylor* v. *State* can not lead to any other conclusion than that it was the opinion of the court, for whom the author of those opinions was speaking, that under the act of 1898 the accused in a criminal case could by a direct bill of exceptions complain of any error committed during the progress of the trial which deprived him of a substantial right and required a reversal of the judgment of the trial court.    These opinions were concurred in by six Justices.    It is claimed now that in subsequent opinions a different rule is laid down.    Any ruling or language, which is in conflict with the ruling in *Taylor* v. *Reese,* that may be contained in the case of *Ocean Steamship Company* v. *Hamilton,* 112 *Ga.* 901, *Ray* v. *Morgan,* Id. 923, and *Darien Bank* v. *Clarke Lumber Company,* Id. 951,

can not be treated as modifying the decision in *Taylor* v. *Reese,* for the reason that none of the decisions named was concurred in by six Justices; the last being concurred in by only four Justices, and the other two by five. There is nothing in *Parker* v. *Medlock,* 117 *Ga.* 813, to conflict with the view now presented; for the reason that it was simply ruled in that case that a direct bill of exceptions would lie in a case where the ruling complained of controlled the verdict. This was true before the passage of the act of 1898. If there is anything said or ruled in *Smith* v. *Smith,* 112 *Ga.* 351, or in *Cable Company* v. *Parantha,* 118 *Ga.* 913, which is in conflict with *Taylor* v. *Reese,* these decisions must yield to the earlier ruling.

3. There appears in the record what purports to be a brief of the evidence in the case, but it does not appear either from the record or the bill of exceptions that it has ever been approved by the trial judge. There are certain recitals in the bill of exceptions from which it might be inferred that it was possible that the alleged brief of evidence had been approved. Before this court can consider a document as a brief of evidence, it must appear affirmatively from the record or the bill of exceptions that the document has been approved as a brief of the evidence introduced on the trial of the case. *Massey* v. *Pitts,* 48 *Ga.* 124; *Spencer* v. *Railroad Co.,* 55 *Ga.* 584; *Porter* v. *State,* 56 *Ga.* 530; *Stephens* v. *Woolbright,* 60 *Ga.* 322; *Harrison* v. *Hall Safe Co.,* 64 *Ga.* 558. It is to be said, to the credit of the able and conscientious public officers who represented the State, that the solicitor-general stated in open court that the document appearing in the record was in fact a correct brief of the evidence, and that both he and the attorney-general consented that it should be so treated by this court. We can not, however, do this, notwithstanding this consent. It is the approval of the brief of evidence by the trial judge which gives this court jurisdiction to consider it. Without such authentication this court has no authority to accept it as a correct transcript of the evidence introduced on the trial; and no consent of parties or counsel can confer jurisdiction to do so. See *Massey* v. *Pitts,* 48 *Ga.* 124; *Porter* v. *State,* 56 *Ga.* 530; *Stephens* v. *Woolbright,* 60 *Ga.* 322; *Harrison* v. *Hall Safe Co.,* 64 *Ga.* 558; *Hicks* v. *Brantley,* 75 *Ga.* 885 (*a*). Some of the earlier decisions contained intimations that consent of counsel

would dispense with the necessity of an approval by the trial judge, but in none of these, so far as we can ascertain, was the point expressly adjudicated, and the decisions above cited settle the rule as we have announced it. It has also been held that consent of counsel can not dispense with the requirements of the law as to the manner in which briefs of evidence shall be prepared. *Augusta Southern R. Co.* v. *Williams*, 99 *Ga.* 75. We shall therefore deal with the case without reference to the alleged brief of evidence appearing in the record.

4-6. As the document purporting to be a brief of the evidence in the case can not be considered, we must look alone to the bill of exceptions and decide the assignments of error entirely with reference to what is therein contained. Some of these assignments can be properly decided from the recitals contained in the bill of exceptions. Cawthon was indicted for the murder of Tucker, it being alleged that his death was brought about by poisoning, the article used being strychnine. Tucker died on the 21st of July, 1903. The court allowed the State, over objection of counsel for the accused, to prove that, ten days before the death of Tucker, Joel Horne, a neighbor, died on the way home from Tucker's house, within an hour or less after taking a drink of peach brandy given to him at that house, and that the symptoms manifested while dying and the condition of Horne's body after death indicated that his death resulted from strychnine poisoning. The court also allowed proof by the State chemist that he had found strychnine in a few drops of brandy taken from the bottle from which Horne was alleged to have drunk. There was no evidence that the accused ever handled or saw the brandy at any time before the death of Horne. The only evidence connecting the accused with the bottle of brandy was the testimony of the daughter of Tucker, to the effect that after the death of Horne the accused poured out the brandy left in the bottle from which Horne was shown to have drunk. This evidence was objected to on the ground that it was evidence of an independent crime not connected with the offense for which the accused was being tried, was irrelevant, and exceedingly prejudicial to the accused. When one is on trial charged with the commission of a crime, proof of a distinct and independent offense is never admissible, unless there is some logical connection between

the two, from which it can be said that proof of the one tends to establish the other. While this rule is general and subject to few exceptions, still there are some exceptions; as when the extraneous crime forms part of the res gestæ; or is one of a system of mutually dependent crimes; or is evidence of guilty knowledge; or may bear upon the question of the identity of the accused, or articles connected with the offense; or is evidence of prior attempts by the accused to commit the same crime upon the victim of the offense for which he stands charged; or where it tends to prove malice, intent, motive, or the like, if such an element enters into the offense charged. See Gillett on Ind. & Col. Ev. § 57; Whart. Crim. Ev. (9th ed.) § 30 et seq.; Kerr's Law of Homicide, § 469; McKelvey on Ev. §§ 156–157; Underhill's Crim. Ev. § 87 et seq.; 1 Bish. New Crim. Proc. § 1120 et seq.; 1 Gr. Ev. (15th ed.) § 53; 1 Crim. Law Mag. 29; *Farmer* v. *State*, 100 *Ga.* 41 (2). In order to justify the admission of evidence relating to an independent crime committed by the accused, it is absolutely essential that there should be evidence establishing the fact that the independent crime was committed by the accused, and satisfactorily connecting that crime with the offense for which the accused is indicted. Even if the evidence establishes the commission by the accused of the independent offense, it is inadmissible until it be shown satisfactorily that that crime had some connection with the transaction then under investigation.

Let it be conceded for the moment that the evidence offered in the present case was sufficient to show that Horne died from the effects of poison which had been prepared by the accused for the purpose of bringing about the death of Tucker; is there evidence so connecting the death of Horne with the death of Tucker as that the murder of Horne by the accused in the manner indicated would throw any light upon the question as to whether Tucker came to his death as a result of a poison administered by the accused with murderous intent? If Horne's death resulted from the drink of brandy given to him by Tucker, then the only connection which the accused was shown to have had with Horne's death was that shown by the evidence of Tucker's daughter, to the effect that she saw the accused pour the brandy from the bottle from which Horne drank. The evidence did not show that Tucker's death resulted from drinking any of the brandy con-

tained in the bottle just referred to.     In the case of Shaffner v.
Commonwealth, 72 Pa. St. 60, it is said that in order for one
crime to be evidence of another, there must be a connection be-
tween them in the mind of the criminal, or it must be necessary
to identify the accused as the person who committed both crimes;
and Agnew, J., in the opinion says: " If the evidence be so dubi-
ous that the judge does not clearly perceive the connection, the
benefit of the doubt should be given to the prisoner, instead of
suffering the minds of the jurors to be prejudiced by an indepen-
dent fact, carrying with it no proper evidence of the particular
guilt."     Mr. Underhill in his work on Criminal Evidence (§ 88,
p. 110) says: " This connection must clearly appear from the
evidence.     Whether any connection exists is a judicial question.
If the court does not clearly perceive it, the accused should be
given the benefit of the doubt, and the evidence should be re-
jected.     The minds of the jurors must not be poisoned and prej-
udiced against the prisoner by receiving evidence of this irrele-
vant and dangerous description ; " citing the language of Agnew,
J., above quoted.     See also Gillett on Ind. & Col. Ev. § 57, p.
81, where the language of Agnew, J., is also referred to with
approval.     Applying this rule, we do not think the evidence
offered for the purpose of connecting the two crimes alleged to
have been committed by the accused was sufficient to authorize
evidence of the independent crime.     We have so far dealt with
the question as if the evidence was sufficient to show that the
accused was guilty of the murder of Horne.     Even if it be con-
ceded as established that Horne died from the effects of strychnine
poisoning administered with felonious intent, the evidence relied
upon to show that the accused was guilty of the murder of Horne
is far from satisfactory.     The circumstances are such as to raise a
grave suspicion, but nothing more than this.     The harmful effect
of the evidence can readily be seen when it is considered how
slightly the two offenses are connected with each other, if there
were really two offenses, as well as how little evidence there was
to establish the independent crime, evidence of which was offered
for the purpose of throwing light upon the question of the guilt
or innocence of the accused of the crime charged in the indict-
ment.     It is apparent from the recitals in the bill of exceptions
that the accused was on trial as much for the murder of Horne as

he was for the murder of Tucker; and as there was no sufficient connection between the two deaths to authorize proof of the homicide of Horne, we feel constrained to reverse the judgment. The accused was entitled to be tried for the offense charged in the indictment, independently of any other offense not connected with the transaction upon which the indictment was based.

7. The State proved by a witness, who was a physician, that he tasted the contents of the bottle from which the State claimed that Horne had drunk poisoned brandy, and that in his opinion it contained strychnine. This testimony was objected to, the court stating that it would not rule upon the question at that time, but would allow the evidence to come in for the present. It does not appear that the attention of the court was called, at any subsequent stage of the case, to the condition upon which this testimony was admitted, or that any motion was made to exclude it. Under the ruling in *Stone* v. *State*, 118 Ga. 704, this affords no cause for a new trial.

8, 9. The accused excepted to the action of the court in receiving the verdict in his absence, the assignment of error in the bill of exceptions being in the following language: "After the evidence, statement of prisoner, the argument of counsel, and the charge of the court had been concluded, and while the jury were out considering their verdict in the case, the presiding judge, with the consent of the defendant's counsel, and in the interest of the safety of the prisoner and the preservation of order, sent the defendant back to jail, and the verdict finding him guilty of murder was received in the absence of the prisoner, who was in jail under this charge and could not control his own movements; and such reception of the verdict in the absence of the defendant being also with the consent of defendant's counsel, who stated that they would take no exception thereto, and in the interest of the prisoner's safety and of the preservation of order. The defendant excepts to the receiving of the verdict finding him guilty of murder in his absence, as being illegal and in violation of his constitutional and statutory right to be present in the court-room when the verdict was received; and says that his counsel, though acting in the most perfect good faith and in the interest of his personal safety, had no legal authority to waive his right to be present; and he says that for this reason the verdict in this case

and the sentence based on said verdict should be held to be illegal, and set aside." Where the accused is in custody and does not consent that the verdict shall be received in his absence, the reception of the verdict while he is thus involuntarily absent will render the same illegal. *Nolan* v. *State*, 53 *Ga.* 137, s. c. 55 *Ga.* 521; Rose *v.* State, 20 Ohio, 31; People *v.* Perkins, 1 Wend. 91; State *v.* Ford, 30 La. 311. It is settled in this State that the voluntary absence of the accused at the time the verdict is received will not vitiate the verdict. *Barton* v. *State*, 67 *Ga.* 653; *Robson* v. *State*, 83 *Ga.* 167 (9). This doctrine finds support in other States. See Fight *v.* State, 28 Am. Dec. 626, and notes on p. 630; Price *v.* State, 36 Miss. 531, s. c. 72 Am. Dec. 195. This view is, however, opposed by the decisions in Andrews *v.* State, 2 Sneed, 550, and Sneed *v.* State, 5 Ark. 431, s. c. 41 Am. Dec. 102. By the great weight of authority the accused may himself waive his right to be present, and there are but few decisions to the contrary. Some of the cases both for and against the rule may be found in the note to Fight *v.* State, 28 Am. Dec. 630. In State *v.* Kelly, 97 N. C. 404, the court draws a distinction between capital and lesser felonies, holding that in capital felonies the prisoner must be present at all stages of the trial, while in others he may waive his right to be present. See also, in this connection, Prine *v.* Com., 18 Pa. 103, 105.

In *Smith* v. *State*, 59 *Ga.* 513, it was held that notwithstanding the accused may be in custody he may consent that the verdict shall be received in his absence, and that a verdict received in his absence in pursuance of such consent is valid, notwithstanding he was at the time confined in jail. This case was not a capital felony, but we are unable to perceive any sound distinction, with reference to the prisoner's right to waive his presence, between this class of felonies and any other. The law is as careful not to deprive a man unjustly of his liberty as it is of his life, and fairness and regularity are required equally in both classes of cases. Without reference to whether the accused in a felony case can waive his right to be present during the progress of the trial between arraignment and verdict, it may be taken as settled that he may make an express waiver of his right to be present at the reception of the verdict, and that a waiver will be implied from his voluntary absence when he is out on bail. The

open question in this State is whether his counsel can make the waiver for him.　　　There is an intimation in *Robson* v. *State*, 83 *Ga.* 167 (9), that counsel might make an express waiver, but the point was not directly involved.　　　In *Mitchum* v. *State*, 11 *Ga.* 630, Judge Nisbet thus speaks of the relation which an attorney bears his client : "He represents his client — he is the substitute of his client; whatever the client may do in the conduct of his cause, therefore, his counsel may do."　　　The weight of authority in other jurisdictions seems, however, to be that counsel can not waive the right of the accused to be present.　　　See Rex v. Streek, 2 Car. & P. 413, 12 E. C. L. 646 ; Fight v. State, 28 Am. Dec. 630 (notes) ; State v. Kelly, 97 N. C. 407, and cases cited.　　　In Rose v. State, 20 Ohio, 34, it was held that counsel could not make an implied waiver by simply failing to object to the reception of the verdict; and that it was doubtful whether he could make an express waiver.　　　These decisions seem to draw no distinction between a waiver made by counsel in the presence of his client and one made in his absence.　　　While counsel may have no implied authority, growing out of the relation of attorney and client, to make a waiver of this character for his client in his absence, we can see no good reason why the accused would not be bound by an express waiver made in his presence.　　　Such a waiver is to all intents and purposes the waiver of the client.　　　It would be trifling with the court to allow it to act upon a waiver thus made, and then impeach its action on the ground that counsel had been guilty of an unauthorized act.　　　And while we recognize fully that there are limitations upon the authority of counsel, the client, even though he be charged with a capital felony, should not be allowed to impeach the authority of his counsel, when he acts in his presence, unless he promptly repudiates the unauthorized act before the court bases action upon it.

Speaking for myself, I am inclined to the opinion that the right to make the waiver resides in the counsel, whether the accused be present or not at the time of the waiver, his authority arising from the mere relation of attorney and client.　　　The reasoning of the courts that hold to the contrary is not, in my opinion, satisfactory or by any means conclusive.　　　Counsel is generally much better able to take care of the rights of the accused than he is himself, and the accused is better protected from improvident waiv-

ers by his case being left to the control of his counsel than if he were to take charge of the same in his own behalf. But under the facts of this case it is not necessary for a direct ruling to be made upon this point, as, in our opinion, a waiver by counsel, in the presence of the accused, unrepudiated by him at the time of the waiver, is so binding as to make valid any action of the court based thereon. When it appears that a verdict has been received, the presumption is that it was received in the manner and under the circumstances authorized by law, and it is incumbent upon him who attacks it to show reasons why it is invalid. The record in the present case discloses that the accused did not himself make an express waiver of his presence. It also appears that his counsel did make an express waiver, but it does not appear that the accused was absent when this waiver was made. It is incumbent upon him to show in his assignment of error that he was absent when this express waiver was made ; for if he was present and did not object to its reception, he would be bound by it. This waiver by counsel appears to have been made after the charge was concluded and while the jury were considering their verdict, and in consequence of this waiver the judge "sent the defendant back to jail." It is therefore to be inferred that the accused was present in the court room at the time of the waiver. In any event, when the accused shows that his counsel had made an express waiver of his right to be present and had agreed with the judge that no exception would be taken to the reception of the verdict in his absence, it will be presumed that the accused was present when the waiver was made, in the absence of a showing to the contrary, and especially would there be such a presumption, if, as claimed, counsel had no implied right to make the waiver.

*Judgment reversed. All the Justices concur, except Fish, P. J., and Candler, J., who dissent.*

CANDLER, J. "Hard cases make bad law ;" and it is because I believe that this maxim is about to be demonstrated in the present case that I feel constrained to dissent from the judgment rendered by the majority.

1. Unquestionably there were instances, prior to the passage of the act of 1898, where this court entertained jurisdiction of bills of exceptions brought directly to various rulings of the trial court, without any motion for a new trial having been made; but

there is not, so far as I am aware, any case in our reports which rules that this was the proper practice, or in which the correctness of the practice was called in question. It will be observed that the only cases cited on this subject in the majority opinion are the first two criminal cases ever brought to this court; and presumably, long before the act of 1898 was passed the practice had fallen into disuse. At all events, the cases cited are at best mere physical precedents, and contain no ruling of benefit in arriving at what the law then was. The General Assembly seems to have realized the need of legislation in order to enable dissatisfied parties to bring cases to this court, under certain circumstances, without first filing a motion for a new trial, and by the act of 1898 they "authorized" the practice, first throwing around it well-defined restrictions. Of all the legislation relating to the bringing of bills of exceptions to this court, this was the first act bearing on this particular practice. How, then, can it be said that the act of 1898 was merely declaratory of existing law.

The case of *Taylor* v. *Reese*, 108 *Ga.* 379, so confidently relied on in the opinion of the majority, I do not think has any bearing upon the case now under consideration. That was a mandamus to require a judge of the superior court to certify a bill of exceptions. Boiled down, the holding of this court was nothing more nor less than that the reason given by the judge for refusing to certify, viz., that no motion for a new trial had been made, was insufficient in view of the act of 1898, and that there was enough in the bill of exceptions tendered the judge to enable this court to clearly understand and pass upon the rulings complained of. A construction of the act of 1898 was not called for, and the statement that that act "simply gives in explicit terms a right of which parties litigant frequently availed themselves before its passage," is purely obiter. I am not willing to concede, however, that Mr. Presiding Justice Lumpkin used the language quoted in the sense given it in the majority opinion. That he meant to recognize that the practice of bringing cases to this court by direct bill of exceptions without a motion for a new trial had been indulged in before the passage of the act of 1898 seems clear; but that it was in his mind to hold, as is now held by the majority, that that act "is not exhaustive of the right of this court to entertain jurisdiction of direct writs of error," I can not

bring myself to believe, in view of the fact that he delivered the opinion in the subsequent case of *Smith* v. *Smith,* 112 *Ga.* 351, where for the first time the construction of the act of 1898 was directly involved, and where it was held in unmistakable language that since its passage " such rulings only as necessarily controlled the verdict or judgment rendered " can be properly brought to this court by direct bill of exceptions without a motion for a new trial having first been filed in the court below. That the interpretation now given by the majority to the ruling in *Taylor* v. *Reese* is forced and utterly unwarranted seems to me to be conclusively demonstrated by the fact that not only was the opinion in *Smith* v. *Smith* written by the same learned Justice who spoke for the court in *Taylor* v. *Reese,* but *Taylor* v. *Reese* is actually cited in the *Smith* case as authority for the position which I now maintain, and in direct connection with the language which I have just quoted ! There are other cases which follow the last cited, not one of which is sought to be overruled, and some of which have been decided by this court as now constituted.     See *Binion* v. *Ga. So. R. Co.,* 118 *Ga.* 282; *Cable Co.* .v. *Parantha, Id.* 913.     I conclude, therefore, that in the present state of the law, where no motion for a new trial has been filed in the court below, a bill of exceptions to this court must, in order to authorize a reversal of the judgment, or indeed to enable this court to consider the questions sought to be made, show that " the judgment, decree, or verdict has necessarily been controlled by one or more rulings " complained of; and that unless the present bill of exceptions comes within that rule, there is no warrant for reversing the judgment of the court below. However true it may be that laws do not always express their meaning, I am willing to give this one the benefit of the doubt and to believe that it means what it says.

2. I fully concur in the opinion of the majority that there is before this court no legal brief of evidence, and that we have no power to act on the suggestion of counsel and consider the unapproved document appearing in the transcript of the record and purporting to be a brief of the evidence introduced on the trial in the court below. It follows that whatever rulings are made by us depending on a knowledge of the evidence must be made solely on the strength of what appears in the bill of exceptions. That

document does not undertake to set out verbatim the testimony of any witness, or to quote in any way from what counsel agreed was a correct brief of the evidence.    It complains in general terms that the court allowed the State to prove the death of Horne after drinking from a bottle of peach brandy belonging to Tucker, and also that the accused was seen to pour out what remained of the brandy in the bottle, and that a few drops of that brandy, when analyzed, were found to contain strychnine.    It does not appear that at the time this evidence was offered it was objected that there was nothing to connect the death of Horne with that of Tucker.    The objection made to it seems to have been that the accused was not put on notice by the indictment that such evidence would be introduced, and that it was not shown that prior to the death of Horne the accused ever had possession of the brandy.    The bill of exceptions does not even state that there was no other evidence to connect the two occurrences.    It is a part of the a, b, c of the law that error will not be presumed, but must be clearly shown ; and I can not consent to hold, where no brief of evidence is before this court, that it was error for the court to admit certain evidence complained of in the bill of exceptions, on the ground that the remaining evidence, which is not here and of which we are, judicially, in complete ignorance, failed to connect it with the crime of which the accused stood charged. I am equally unwilling to hold, as must be done in order to say that the ruling complained of constrained the verdict, that the jury were compelled as matter of law to believe these witnesses or that without their testimony the accused might not legally have been convicted.

3. While I freely admit that evidence of the poisoning of Horne as an independent crime would not be admissible to prove that the accused killed Tucker, I maintain that evidence of a previous attempt by the accused to kill Tucker was admissible, and that its admissibility was not affected by the fact that it incidentally developed that in the attempt mentioned Horne lost his life.    And where, as was done in this case, the trial judge especially instructed the jury that they were not to consider the evidence as going to prove that the accused was guilty of an independent crime, I insist that the admission of the evidence was not erroneous.    It was shown that Horne died under suspicious cir-

cumstances áfter drinking Tucker's brandy, which the accused had had an opportunity to poison; and that immediately thereafter the accused was seen to pour out the brandy that remained in the bottle.    It was also shown that a few drops of brandy sticking to the sides óf the bottle contained strychnine.   The jury might well have inferred that the pouring out of the brandy by the accused was done for the purpose of concealing the fact that it had been poisoned; and this, in my opinion, furnished a sufficient link to connect the so-called independent crime with the one of which the accused was charged.   On the trial of A for shooting and killing B, evidence that some time previously to the transaction under investigation A had shot and killed C would not, without more, be admissible; but there could be no objection to showing that in an attempt to kill B, A had shot at him but missed him and killed C.    Of like character, in my opinion, is the evidence in the present case of the death of Horne.

I can see no warrant for reversing the judgment on anything appearing in the present bill of exceptions.