## OWENS *v.* THE STATE.

1. The evidence authorized the verdict.
2. The admission of evidence as set out in division 2 of the opinion was not error for any reason assigned.
3. The charge complained of, and as set out in division 3 of the opinion, was not error for the reason assigned.
4. Newly discovered evidence which is merely cumulative or impeaching in character does not require the grant of a new trial.
5. The court did not err in overruling the motion for new trial.

No. 5474.   JANUARY 15, 1927.

Murder.   Before Judge Roop.   Meriwether superior court.   April 13, 1926.

*N. F. Culpepper,* for plaintiff in error.

Criminal Law, 16 C. J. 575, n. 61; p. 579, n. 99; p. 1180, n. 75; p. 1199, n. 56; p. 1202, n. 70.

Homicide, 30 C. J. p. 203, n. 82; p. 211, n. 95; p. 310, n. 25; p. 346, n. 86.

36

*George M. Napier, attorney-general, W. Y. Atkinson, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HILL, J. Dan Owens and Jim Hunt were jointly indicted for the murder of Clarence Howe. When the case was called for trial Jim Hunt demanded a severance, and the State elected to try Dan Owens, who was put upon trial. The jury returned a verdict of guilty against Owens, with a recommendation to the mercy of the court; and he was accordingly sentenced to the penitentiary for life. He filed a motion for new trial on the usual general grounds, and on three special grounds, which was overruled, and he excepted.

1. Counsel for plaintiff in error argues the general grounds, and insists that the verdict is contrary to evidence; that "all of the evidence fails to prove the essential elements of murder," that if the evidence for the State be true it would be a typical case of voluntary manslaughter; and that if the evidence offered by the defendant be true, it was a clear case of justification. To the first of these contentions we can not agree. The evidence for the State makes out a case of murder, and the jury were authorized to so find. Even if the evidence for the defendant makes out a case of voluntary manslaughter or justifiable homicide, the jury were fully instructed on the law of those subjects; but they accepted the evidence of the State, which showed a killing without justification, alleviation, or extenuating circumstances. Hattie Howe, a witness for the State, who identified the defendant, testified in part as follows:—"I knew Clarence Howe. He is dead. He was killed. Dan Owens killed Clarence Howe with a shotgun, shot him with a shotgun, on the 27th day of December, 1925, last year. The killing took place in Meriwether County at Chalybeate Springs, at my home. Clarence Howe was my husband. The killing took place in the daytime. I was there at the time it took place, and saw it. Clarence, my husband, was at the woodpile. Jim Hunt and Bud, they was in the house. They come in the house at the same time. They had wood and put the wood on the fire. Jim Hunt was standing there at the fireplace. He told Clarence, 'I am in your G— d— house, and you can't get me out. I am in your G— d— house, Clarence Howe, and you can't get me out, and I ain't going to get out until I get ready.' That was Jim Hunt said that. Dan Owens was standing in there. They were standing right together. Clarence he didn't say nothing to

him. Directly Jim Hunt got up and walked back in the other room and called him. He didn't go when he called him that time. He called Clarence. Jim Hunt called Clarence. Dan Owens at that time was still standing in the room at the fireplace. He didn't go when he first called him, and Jim Hunt called Clarence again, and he got up and went on. After Clarence went in there Dan Owens went in there. A few minutes after I went in there. I heard them in there quarreling, heard Jim Hunt and Clarence quarreling. Dan Owens was in there at that time. Nobody but them three men were in the room. That was an adjoining room to where I was. I got in there, and Jim Hunt had my gun, my shotgun. I tried to take it away from him, and I couldn't take it away from him. So my auntie came in there. I called to Bud and asked him what the trouble was. Bud didn't say nothing to me. When I say Bud, I mean Dan Owens. I asked him, and he didn't say nothing. I begged Jim, 'Don't throw the shotgun up in the room where my little children are,' and shamed him. Me and him and my auntie tusseled until we taken the shotgun away from him, from Jim Hunt. Bud reached over my shoulder and taken the gun away from me. When I taken it away from Jim Hunt, me and my auntie, Bud taken it away from me. I told him, 'Bud, you ought to be shamed of yourself, to run over my house, my little children, and me and you kin folks.' He didn't say nothing. Clarence, he wasn't in there; done sent him back around in the other room; and so I went on around there in the other room, and I says, 'Clarence, pay these folks and let them get out of here before they hurt some of my children.' At that time Clarence had done gone in the other room where the fireplace was, in the adjoining room to where the trouble was. After I took the shotgun away from Jim Hunt and Dan Owens took it away from me, he was standing back there in the floor with the shotgun. I went there and tried to take it away from him. I couldn't take it away from him. Dan Owens had a pistol and the shotgun too, and I was scared to try to take it away from him. I went on out and left him. My auntie she went there and tried to take it away from him. All that was in the room where I was. I couldn't take it away from Dan Owens, so I went in the other room and Jim Hunt come on in there too. Bud, Dan Owens, he loaded the shotgun back there in the back room. I could see him;

he loaded the gun. I was standing in the front room when he loaded it out of his own pocket. I told Clarence to pay them, so they could get out before they hurt my little children. Clarence handed Jim Hunt a dollar, and Jim Hunt handed him 50 cents. Jim Hunt looked at him and says, 'I ought to shoot your G— d— brains out.' That time Bud was passing on out the door. He looked up and says 'Shoot his G— d— brains out,' and Bud jumped off the porch and shot him when he was crossing the door. He was shot back here [indicating]. Q. Under the arm, you remember which side? A. Yes, sir, right side. At the time Dan Owens shot Clarence he was about as far from him as that white man standing right there [indicating], I reckon twelve or fifteen feet. Clarence and Dan Owens hadn't had any words at all. Dan hadn't said nothing to him, and he hadn't said nothing to Dan. Neither one of them hadn't had any words at all. At the time of the shooting Clarence was not trying to hurt Dan Owens. Clarence didn't have any weapon at all in his hand. I was standing in the room where they killed him. Clarence was in the room. Dan Owens was out doors there on the ground. I didn't see Jim Hunt after he got off the porch, I didn't see him. He went out of the house with Dan Owens. Jim Hunt was going out of the door at the time he told Dan Owens to shoot him. He and Dan Owens both were going out. Dan and Clarence wasn't fussing at all. Jim Hunt and Clarence was the ones fussing. After the shooting Dan Owens and Jim Hunt walked off. I had sent for Mr. Starling [the constable], and Mr. Starling he was there—they was mighty near there when the gun fired. Dan Owens and Jim Hunt never come back to the house after the shot was fired. Clarence Howe didn't live but about one minute after he was shot. He was killed almost instantly. He never did say nothing. Buck Ray was present there in the house at the time of the shooting and immediately before the shooting, and my aunt, Julia Revill." Julia Revill testified to substantially the same facts as Hattie Howe. There was nothing in the testimony of either of the State's witnesses which tended to show any circumstances of justification, alleviation or mitigation.

The defendant, Dan Owens, made the following brief statement: "When I got there I went in the far room and went to gambling and got to squabbling over the cut quarter. He took a dollar of

mine, and I asked him to hand it to me, and he run over and got his gun behind that dresser, and them women got hold of it, and I caught hold of it too, and when it was took I had it. The crowd went in the other room in a hurry, and I went in behind him and went on to the door. I went to the door and looked back, and he shot at me twice, and I threw it up and shot at him and hit him, kinder shot back that way [indicating]."

Abe Woodall, sworn for the defendant, testified in part. as follows: "The next room we was in, didn't nobody go in there. I saw Dan Owens there. I saw Jim Hunt. They were in the back room from the fireplace. Wa'n't nobody in there but just them. Jack Copelan was in the room where I was. He wasn't in the back room. They were skinning in the back room for money, gambling. They was to give Clarence a quarter of every deal to gamble in the house. That is what the fuss got up about. Wanted to cut a quarter out of every deal they made. They was going to give Clarence, all the boys, a quarter, and Jim didn't pay his, and that is where the fuss first come up. When it first started Clarence jumped up and run around a piece of old dresser in the corner and got a shotgun, got the shotgun from behind the dresser. Clarence Howe got the gun from behind the dresser. From that they begin arguing. They got to tusseling over the shotgun, and Bud Owens took the gun and run out the door. After Bud Owens got the shotgun he run out the door. After Bud went out the front door Clarence shot at him twice with an automatic pistol. I don't know where he got it. When I seen it he had it out in his hand. Clarence had the pistol in his hand. Dan was out doors. Clarence went towards the front door with the pistol in his hand. When he got to the door he threw it up and shot. He had his arm in a shooting position. He was shooting at Bud. I mean by Bud, Dan Owens. Clarence shot his pistol twice. Q. Is that when he was shot, before he shot the pistol or after he shot the pistol? A. Before he shot. Q. When was it that Dan Owens shot Clarence Howe? A. After Clarence shot at him. Q. How many times? A. One time. At the time the shotgun fired Clarence had his arm about this way [indicating]. He was standing in the door. Dan Owens was out there in the yard. I didn't see the wound, the place where Clarence Howe was shot, never did see it. Jack Copelan was there at the time of the shooting. Me

and him was there in the room. He was in the room with me. That is all that was in the room. Just me and Jack. The women were out of doors. Buck Ray was around there, but he was out of doors somewhere. He wa'n't in there where us was."

Jim Hunt, as a witness for the defendant, testified, among other things: "Dan was in the yard when Clarence come to the door. Clarence shot twice, and then Dan shot. Clarence was standing in the door when Dan Owens shot him. I don't know how that gun got loaded. I didn't see it loaded."

There was some other evidence tending to corroborate the above testimony of the defendant's witnesses. J. B. Jarrell, the sheriff of Meriwether County, testified that two days after the killing Dan Owens came and gave himself up in front of the court-house in Greenville.

Under the evidence for the defendant the jury would have been authorized to find a verdict of justifiable homicide. The trial judge instructed the jury on the law of justifiable homicide; but the jury saw fit, as they were authorized to do, to believe the witnesses for the State rather than the witnesses for the defendant; and we can not say, under the evidence, that they were not authorized to find the defendant guilty of the crime of murder.

2. The first special ground of the motion for new trial is as follows: "Because the following material evidence was illegally admitted to the jury by the court over the objection of movant, to wit (witness J. F. Starling sworn for the State): 'Dan Owens and Jim Hunt stopped right in the middle of the road. I told this negro, Dan Owens, to drop that gun. When I told him to drop his gun, Jim Hunt handed him a pistol, put his hand in his pocket and pulled out his pistol and gave it to him, and says, "Don't run a step," and he put the pistol in his pocket and threw up the shotgun to shoot me. Dan Owens is the man that drew that gun. Jim Hunt handed the pistol to Dan Owens. Dan Owens had a single-barrel breach-loading shotgun. I arrested Jim Hunt there. I wasn't able to arrest Dan Owens; he ran.' Movant objected to the admission of such evidence at the time same was offered, and did then and there urge the following grounds of objection thereto: 'I object to that; that is irrelevant and prejudicial to this defendant, what happened between him and this man, who had no warrant and no authority to arrest him.' Which

objections the court then and there overruled, which said ruling of the court movant insists was error and was contrary to law and most hurtful to movant, and movant insisted then in his objection to such evidence that the same was most hurtful and prejudicial to movant, and that said witness had no right or authority to arrest him, said witness testifying, in this connection, as follows: 'I shot at Dan Owens. He drew a gun on me and was fixing to shoot me. He was standing there when I shot at him. He wasn't running when I shot at him. I shot at him when he was standing still. I shot twice; thought I would stop him when he went to run. I did not have any warrant for him. . . I never did get any closer than fifty yards of them. After I got to the house, then I learned that Dan Owens had shot this man with a shotgun, and I went down to near where he was. I got about fifty yards of him. I commenced shooting at Dan Owens when he raised this gun. He didn't shoot at me at all.' Q. 'He ran away because you were shooting at him?' A. 'I told you he did.' J. F. Wilson, sworn for State, testified in this connection: 'Dan was not running when my father-in-law [Starling] shot at him. If I am not mistaken, Dan was standing still at the time my father-in-law shot at him three times. If I am not mistaken, Jim Hunt told Dan Owens not to shoot.' Movant insists that the evidence here quoted and offered by the State, and that same is not contradicted by any testimony, and that same shows there was no warrant authorizing the arrest of Dan Owens, and that such evidence shows he was making no effort or attempt to escape; and movant insists that the court committed error that was most hurtful in permitting Starling, a white man, to testify that Dan Owens did and acted in the way set forth in the evidence." We·are of the opinion that the evidence objected to was admissible as a part of the res gestæ, and as illustrating the quo animo of the defendant. See *Cawthon* v. *State,* 119 *Ga.* 395, 409 (46 S. E. 897) ; *Johnson* v. *State,* 88 *Ga.* 203 (14 S. E. 208) ; *Lee* v. *State,* 8 *Ga. App.* 413, 417 (69 S. E. 310). It has been held that where a defendant has killed one and in trying to escape attempts to kill another person, such acts of violence are admissible on his trial for murder. *Revel* v. *State,* 26 *Ga.* 275 (4) ; *Davis* v. *State,* 11 *Ga. App.* 804 (2) (76 S. E. 391).

3. The second special ground of the motion is as follows: "Be-

cause the court erred in charging the jury as follows, to wit: 'Now the law presumes every homicide malicious until the contrary appears from circumstances of alleviation, or excuse, or of justification, and it is incumbent on the prisoner to make out such circumstances to the satisfaction of the jury, unless they appear from the evidence produced against him. Now while it is true that the law presumes malice when a homicide is shown, yet the presumption of malice may be rebutted by proof offered either for the State or for the defendant, for either or for both.' Movant insists that such charge of the court is error and was contrary to law and harmful to movant under the evidence, facts, and circumstances of the case. Movant insists that the unqualified statement, 'The law presumes every homicide to be malicious until the contrary appears,' is not a correct statement of the rule of law in the case of movant. Movant insists that the charge here complained of placed the burden upon him to prove that he was not guilty of murder, and movant insists that under the evidence in his case it was improper for the judge and court to instruct the jury as he did when he stated, 'it is incumbent on the prisoner to make out circumstances of alleviation, of excuse, or of justification,' because as movant insists there is not a single witness whose testimony excluded all inference of alleviation, mitigation, or justification. Movant insists that such charge here complained of is proper only in such cases where at least one witness gives testimony that shows no circumstances of necessity, palliation, alleviation, or justification; but movant insists in his case that the witnesses by whom the State undertook to prove that movant committed the homicide each disclosed in such testimony circumstances of alleviation or justification, and that it is clear that the jury could have inferred such circumstances from the witnesses who testified for the State, and by whom the State did show the fact of the killing. Movant insists that when the fact of the killing is shown, and the evidence adduced to establish the killing shows circumstances of justification or alleviation, malice may not be inferred, and that there is no presumption of malice if the evidence adduced to establish the killing shows circumstances of justification or alleviation, and that if the evidence relied upon by the State to show the killing contains circumstances of alleviation or justification, the burden of proving the crime was not murder is not shifted, and such

burden was not shifted upon the defendant in this case; and movant insists that these are correct principles of law applicable in his case, and that the charge here complained of is contrary to these principles of law.  Movant says that the evidence shows that a dispute and controversy arose in the home of the decedent, participated in by the decedent, movant, one Jim Hunt, the wife of the decedent, and her aunt, and that there was a general row and struggle for the possession of a shotgun that belonged to the decedent, and that there was much cursing and excitement among the parties referred to immediately preceding the shooting, which must have occurred during such row and excitement.  These facts were testified to by the witnesses for the State, movant insists, and each of the two witnesses by whom the State proved that movant shot and killed the decedent with a shotgun also in the same breath testified to such facts and circumstances as would have excited passion and dethroned reason of movant; and movant insists that these facts and circumstances so testified to by each witness relied upon by the State to prove the killing would have negatived the presumption of malice which would otherwise arise upon the bare proof of the homicide, had the jury, from all the evidence, believed them to be proved. Movant insists that said charge complained of was erroneous, because it eliminated the statement of the defendant as being sufficient to rebut such malice so presumed if the jury saw fit to do so."  In support of these contentions the plaintiff in error cites the cases of *Owens* v. *State,* 120 *Ga.* 296, 299 (48 S. E. 21), *Perkins* v. *State,* 124 *Ga.* 6 (52 S. E. 17), and *Green* v. *State,* 124 *Ga.* 343 (4, 5), 344 (52 S. E. 431).  We have examined these cases, but, under the facts of this case, do not think they are applicable.  The charge complained of was fully qualified as to justification, mitigation, excuse, etc.  The evidence for the State did not show any circumstances of justification or mitigation, etc. We are of the opinion that the charge was a correct one, and was properly qualified, and is not subject to the criticism made against it.

4.  The third special ground of the motion for new trial relates to certain newly discovered evidence of Arthur Alford, who makes an affidavit that he is familiar with the house and place where the shooting occurred and knows the location of the room

in the house in which Clarence Howe was shot and killed, and the door leading from the room on to the front porch of the house, and the location of the front porch, and that portion of the front porch that extends from the door to the front, and to the steps leading upon the front porch; that he got to the house of Clarence Howe not more than ten minutes after he was shot, and that he "saw two brass hulls or brass shells" that were empty; they were shells of pistol-cartridges of the kind used in automatic pistols; these two hulls or shells were lying on the floor of the porch in front of the door where Clarence Howe was shot; witness picked up one of the shells, looked at it, and threw it down; he did not pick up the other one; he saw these shells as soon as he got to the house. Manifestly, this newly discovered evidence is merely cumulative of that in which witnesses for the defendant testified that Clarence Howe had shot at Dan Owens with an automatic pistol before Dan Owens shot the deceased. Under repeated rulings of this court, newly discovered evidence which is merely cumulative or impeaching in its character does not require a new trial.

5. The evidence authorized the verdict, and the court did not err in overruling the motion for new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting.*